# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
   Plaintiff,

 v.            Case No. 06-CR-257

**ANDREW BANDY**
   Defendant.

## SENTENCING MEMORANDUM

Defendant Andrew Bandy pleaded guilty to bank fraud arising out of a scheme he devised to embezzle money from his employer by submitting false invoices for work performed on properties he managed. The parties initially disputed the loss amount under the sentencing guidelines,[1] but ultimately agreed to an offense level of 16: base level 7, U.S.S.G. § 2B1.1(a)(1), plus 10 for loss, § 2B1.1(b)(1)(F), plus 2 for abuse of a position of trust, § 3B1.3, and minus 3 for acceptance of responsibility, § 3E1.1. Coupled with defendant's undisputed criminal history category of I, the guidelines produced an imprisonment range of 21-27 months. I found this range correct and accordingly adopted it.

---

[1] The PSR posited a loss amount of about $222,000, but defendant presented evidence that about $30,000 of that amount pertained to work actually performed for the victim by a contractor named James Evans. Defendant therefore sought an offset pursuant to U.S.S.G. § 2B1.1 cmt. n.3(E), which provides that loss "shall be reduced by . . . the fair market value of the . . . services rendered[] by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." The government and the victim initially disputed the offset and claimed that Evans did not even exist. However, defendant was able to locate Evans, and the parties confirmed that he, in fact, performed the work at issue and was paid about $27,000. The government also confirmed that an amount the victim suspected represented double billing for the Evans project was already included in the PSR's loss figure. The government then indicated that it wished to dispute the fair market value of the services Evans rendered, but it ultimately withdrew that opposition on the day of sentencing and agreed that the correct guideline range was 21-27 months.

The government advocated a within-guideline sentence of 24 months, while defendant requested a non-guideline sentence of 12 months and 1 day. Upon consideration of all of the factors set forth in 18 U.S.C. § 3553(a), I elected to impose a sentence of 15 months imprisonment, followed by five years of supervised release with various special conditions. This memorandum sets forth my reasons. See 18 U.S.C. § 3553(c).

## I. SENTENCING PROCEDURE

In imposing sentence, the district court must first calculate the advisory guideline range, then select an appropriate sentence under all of the factors set forth in 18 U.S.C. § 3553(a). See Gall v. United States, 128 S. Ct. 586, 596 (2007); United States v. Holt, 486 F.3d 997, 1004 (7th Cir. 2007). The § 3553(a) factors include:

(1)  the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)  the need for the sentence imposed–

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)  the kinds of sentences available;

(4)  the advisory guideline range;

(5)  any pertinent policy statements issued by the Sentencing Commission;

(6)  the need to avoid unwarranted sentence disparities; and

(7)  the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The statute directs the court, after considering these factors, to impose a sentence that is "sufficient but not greater than necessary" to satisfy the purposes of sentencing – just punishment, deterrence, protection of the public and rehabilitation of the defendant. Id. As the Supreme Court recently explained, this so-called "parsimony" clause represents the "overarching provision" of the statute. Kimbrough v. United States, 128 S. Ct. 558, 570 (2007); see also United States v. Ferguson, 456 F.3d 660, 667 (6th Cir. 2006) (stating that the parsimony provision serves as "the guidepost for sentencing decisions post-Booker"). The parsimony provision requires the district court to impose the least severe sentence necessary to satisfy the four purposes of sentencing enumerated in the statute. United States v. Santoya, 493 F. Supp. 2d 1075, 1077 (E.D. Wis. 2007).

In determining a sufficient sentence, the Supreme Court has also explained that the district court may not presume that the guideline sentence is the correct one. Rita v. United States, 127 S. Ct. 2456, 2465 (2007); see also United States v. Demaree, 459 F.3d 791, 794-95 (7th Cir. 2006), cert. denied, 127 S. Ct. 3055 (2007). Rather, after accurately calculating the advisory range so that it "can derive whatever insight the guidelines have to offer, [the district court] must sentence based on 18 U.S.C. § 3553(a) without any thumb on the scale favoring a guideline sentence." United States v. Sachsenmaier, 491 F.3d 680, 685 (7th Cir. 2007); accord United States v. Wachowiak, 496 F.3d 744, 749 (7th Cir. 2007); United States v. Schmitt, 495 F.3d 860, 865 (7th Cir. 2007); United States v. Griffin, 493 F.3d 856, 868 (7th Cir. 2007).

## II.  DISCUSSION

**A.    Nature of Offense**

Defendant worked as a property manager for Mallory Properties.  As part of his duties, he was authorized to approve invoices for work performed on the properties under his supervision.  Between April 2003 and August 2005, defendant used his position to steal from Mallory.  His scheme worked in two ways.  First, he took payment checks for legitimate invoices and deposited them into several bank accounts at his disposal.  He then took the same invoices, broke them down into several smaller invoices, and resubmitted them for payment, using the smaller checks to pay the vendors.  Second, he created fraudulent invoices for work never performed.  In some cases, the listed contractor on these invoices did not even exist.  He then deposited the payment checks into various bank accounts to which he had access.

The crime was quite serious, as defendant abused the trust of his employer and stole a substantial amount of money over an extended period of time.  As a result, Mallory had to institute new policies and procedures to verify invoice payments.  As Mallory's representatives explained at sentencing, the crime affected them both emotionally and financially, and as I stated on the record, they quite rightly felt violated.

Defendant's motives for committing the offense were not entirely clear.  He indicated that he was at the time going through a difficult divorce and concerned about providing for his children. He also admitted to living beyond his means.  However, Mallory paid defendant pretty well, and he presented no evidence of great financial hardship explaining the crime.

**B.    Character of Defendant**

Defendant was forty-seven years old and had no prior criminal record.  The divorced

4

father of two sons, ages fifteen and thirteen, defendant was by all accounts an excellent parent. Despite strained relations with his ex-wife, she had agreed to allow the youngest to live with him. Other family members also made positive statements about defendant's character.

Defendant's mental and physical health appeared to be sound, and he had no substance abuse issues. A high school graduate with some college education, defendant compiled a solid work history. Following his termination by Mallory, he obtained a well-paying job as a property manager for another company, but that employer terminated defendant when it learned about this offense via an anonymous phone call. As I indicated during the sentencing hearing, it is not clear who made the call,[2] but the loss of this job clearly impacted defendant's ability to make restitution (and ended up benefitting no one). Defendant intended to re-pay Mallory and shortly after the offense was discovered signed over a motorcycle worth about $18,000 as a sign of good faith. He also took up residence in his office at his new work place in an effort to save money. Once he lost the property manager job, he became a self-employed contractor performing remodeling and drywall work, earning much less. Further, because his child support payments were based on his old salary, he quickly amassed arrears and was unable to make restitution.

The probation office indicated that defendant had, since being charged with this offense, complied with the conditions of release and been truthful in his dealings with that office. The supervising officer confirmed that he worked hard as a contractor, often reporting to her office covered in dust. He also sat down with his two sons and admitted to them what he had done, and expressed genuine remorse for his crime, indicating that he was humiliated by his downfall.

---

[2] Defendant believed it was someone from Mallory.

5

I found two things striking about defendant's conduct since his arrest in this matter. First, as explained above, defendant tried to make the best of his situation since his termination by Mallory. He made an effort to commence restitution, turning over the motorcycle; promptly found another well-paying job as a property manager and lived out of his office to try to save money; when he lost that job, he commenced hard physical labor as a contractor, moving into a very modest apartment on the south side of Milwaukee. He expressed genuine remorse for his crime, both to the probation office and during his allocution at sentencing, and admitted his crime to his two sons.

Second, despite obvious questions about defendant's credibility given his past conduct, defendant's claims during this procedure were proven true through strong adversarial testing. The victim initially denied that defendant turned over the motorcycle in lieu of restitution, but defendant was able to submit documentation supporting his position. The victim also initially denied defendant's claims about James Evans, but defendant was able to locate Evans and substantiate the work Evans had performed for Mallory. The victim was quite rightly skeptical of defendant's claims given his past deceit, but defendant's ability to substantiate these claims – while continuing to accept full responsibility for his crime – bolstered his credibility and seemed to be of a piece with his other, positive post-offense conduct set forth above. Post-Booker, I may consider these positive aspects to a defendant's character, which the guidelines do not. See Schmitt, 495 F.3d at 865.

**C.    Purposes of Sentencing and Guidelines**

Given the seriousness of the offense, which included an abuse of trust and theft of a substantial amount of money, I concluded that a significant period of confinement in prison was needed to provide just punishment, promote respect for the law and to deter others. 18 U.S.C.

6

§ 3553(a)(2)(A) & (B). However, given defendant's lack of record and his post-offense conduct recounted above, I did not see a clear need to protect the public. He certainly posed no threat to public safety, and to the extent that he posed a risk of future crimes of dishonesty I concluded that strict monitoring in the community would suffice to protect the public.[3] See 18 U.S.C. § 3553(a)(2)(C). Given the fact that defendant had never been in jail before – and thus any term of imprisonment would be significant to him – I did not see a need for a lengthy term to deter defendant from future crimes. See 18 U.S.C. § 3553(a)(2)(B). I also recognized the need to make restitution to the victim, which defendant could obviously better do in the community than in prison. See 18 U.S.C. § 3553(a)(7). Defendant did not appear to have correctional treatment needs. See 18 U.S.C. § 3553(a)(2)(D).

I acknowledged defendant's relationship with his children, as well as the fact that imprisoning him would require alternate placement for the youngest. However, I concluded that a prison term was nevertheless necessary given the severity of the crime. Defendant indicated that his youngest son would likely stay with an uncle during his prison term, so the child would not be left without supervision (and need not return to his mother, from whom he was

---

[3]The government indicated that defendant had been accused of theft by a previous employer. However, this alleged offense was never reported to police, much less charged. In any event, whatever occurred there, as I noted at the sentencing hearing, the offense behavior before me was certainly sufficient to raise questions about defendant's honesty and to require substantial prison, given the amount stolen and the length of time over which the theft occurred. The question I had to answer was, how much prison was necessary to satisfy the purposes of sentencing. I could not reasonably imprison defendant forever; his release, at some point, was inevitable. (The victims urged me to impose the maximum prison term allowed by law, which for bank fraud is thirty years. While I understood and appreciated their strong feelings about the case, a sentence that would likely amount to life would not have been reasonable for this crime.) I sought to ensure the protection of the public from similar crimes by imposing the maximum supervision term allowed by law, with strict conditions. Given defendant's objectively verifiable conduct since this offense came to light, I found such a sentence sufficient to satisfy all of the purposes of sentencing.

7

apparently estranged).

Under all of these circumstances, I concluded that a sentence of 15 months in prison was sufficient but not greater than necessary. This sentence varied from the guideline range by just 2 levels and was supported by the particular facts of the case, and thus created no unwarranted disparity. See 18 U.S.C. § 3553(a)(6).

### III. CONCLUSION

Therefore, I committed defendant to the custody of the Bureau of Prisons for 15 months followed by five years of supervised release with strict financial and reporting conditions. Specifically, I forbid defendant from employment having fiduciary responsibilities unless he first notified the employer of his conviction or from holding self-employment having fiduciary responsibilities without the consent of the supervising probation officer. I further forbid him from opening new lines of credit without the prior approval of the supervising probation officer and required him to provide all financial information requested by the probation officer. See Gall, 128 S. Ct. at 595-96 (discussing the substantial restriction of an offender's liberty based on such conditions of supervision). Finally, I ordered full restitution to Mallory and its insurance company, requiring defendant to make payments under the Bureau of Prisons' Inmate Financial Responsibility Program while incarcerated, devoting 50% of any prison wages to this obligation, and to make regular monthly payments and to devote any tax refunds to restitution after his release. Other terms and conditions of the sentence appear in the judgment.

Dated at Milwaukee, Wisconsin, this 22nd day of January, 2008.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge